UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION

NF

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| DAVID NORKIN, | : | Case No. 97-50043 (AHWS) |
| Debtor. | : | |
| DAVID NORKIN, | : | |
| Plaintiff, | : | Adversary Proceeding No.: |
| v. | : | 02 5015AHWS |
| CRAIG W. GALEA and MARK C. KRUSE | : | |
| Defendant. | : | April 8, 2002 |

### VERIFIED ADVERSARY COMPLAINT

The debtor, David Norkin ("Debtor"), in the above captioned matter, hereby brings this adversary proceeding as plaintiff against Craig W. Galea and Mark C. Kruse (the "Creditors"). Upon information and belief the Debtor submits the following:

**I.  Summary**

1.  This adversary proceeding is brought pursuant to Fed. R. Bankr. P. 7065 *et seq.* and 11 U.S.C. § 105, seeking injunctive relief against the Creditors to stop them from foreclosing on real estate owned by the Debtor. If the Creditors are permitted to proceed with their foreclosure action, the estate will be rendered insolvent and the Debtor's plan for reorganization will be severely prejudiced. Accordingly, the Debtor seeks an order from the Court enjoining the Creditors from pursuing their state court foreclosure action against the Debtor's property.

**II.  Parties**

2.  The plaintiff in this action is the Debtor, David Norkin, an individual with his



principal abode in Greenwich, Connecticut. The Debtor voluntarily filed a petition for bankruptcy under Chapter 11 of the United States Bankruptcy Code (Case No. 97-50043).

3.  The defendants in this mater are the Creditors, Craig W. Galea and Mark C. Kruse, individuals with their principal place of business in Larchmont, New York.

### III. Jurisdiction and Venue

4.  This adversary proceeding is initiated pursuant to 11 U.S.C. § 105 and Fed. R. Bankr. P. 7065 *et seq.*

5.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157(a) and 1334(b). This matter is a core proceeding pursuant to 28 U.S.C. § 157.

6.  Venue is proper pursuant to 28 U.S.C. § 1409.

### IV. COUNT ONE: Breach of Contract

7.  On January 7, 1997 (the "Petition Date"), David Norkin (the "Debtor") filed a voluntary petition for reorganization under Chapter 11 of Title 11 of the United States Code (the "Code"). Since that time, the Debtor has continued to function as debtor-in-possession pursuant to 11 U.S.C. § 1107.

8.  The Debtor's primary asset is stock in a company known as Britestarr Homes, Inc. ("Britestarr"), a New York corporation. Britestarr's sole asset is a twenty eight (28) acre parcel of land located in the Bronx, New York. (A property description is attached hereto as Exhibit A.) A power plant can be constructed on this property to service New York City, thus, the Debtor believes that the property has a value of as much as $50,000,000.00.

9.  The Creditors have been attempting to foreclose on the property owned by Britestarr (the "Britestarr property") in New York state court, pursuant to a judgment of foreclosure dated January 5, 2001 in <u>Galea et al. v. Britestarr Homes, Inc. et al.</u>, Index No.

16677/96, pending in New York state court. The amount of their judgment is $1,335,529.42. (A copy of the judgment is attached hereto as <u>Exhibit B</u>.)

10. Due to the high value of the Britestarr property, there is a sufficient equity cushion in the Britestarr property to adequately secure the Creditors' lien and still provide adequate money to fund a plan for reorganization following a sale of the property.

11. Prior to and after declaring bankruptcy, on a daily basis on behalf of Britestarr, the Debtor has been in the process of seeking out a potential buyer for the property and began receiving offers, on behalf of Britestarr, for an option to buy the Britestarr property.

12. The sale of the property is critical to the Debtor raising sufficient money to fund a plan for reorganization. Because of the proposed use of the property, there are significant land use and regulatory matters that must be resolved prior to any closing, requiring significant due diligence.

13. After considerable effort, the offer the Debtor finally accepted on behalf of Britestarr was with ABB Energy Ventures, Inc. n/k/a ABB Equity Ventures, Inc. ("ABB"). The reason the Debtor accepted this offer on behalf of Britestarr was because it was the best possible opportunity to maximize the value of the property for the estate. Moreover, given the years of due diligence involved, ABB appeared to be the best prospective buyer, given its experience and capabilities.

14. An Option Agreement was executed December 31, 1998. Under the terms of the Option Agreement, a closing was supposed to occur in November 2000. (A copy of the Option Agreement is attached hereto as <u>Exhibit C</u>.)

15. Depending the Option Agreement is interpreted, the sale price is between $30,000,000.00 and $35,000,000.00. The Debtor believes that the Britestarr property is worth even more.

16. Another reason Britestarr entered into the Option Agreement with ABB was based on the favorable terms that were offered: (a) ABB owned a construction company that could handle the intended development of the Britestarr property, (B) ABB owned a company that manufactures power generators, (C) ABB, while offering lower option payments than other suitors, agreed to grant Britestarr an internal rate of return of 19 - 22% ownership in the power plant to be constructed, which was a value of approximately $7,500,000.00 per year for 30 years, (D) ABB promised Britestarr a $3,000,000.00 - $5,000,000.00 loan against its expected ownership interest, and (E) ABB expected to exercise its option and have a financial closing by November 2000. Further, ABB agreed to make certain option payments to Britestarr.

17. ABB failed to make the option payments on time.

18. ABB failed to make its option payment due for December 1, 2000. At that time Britestarr, by and through the Debtor, entered into negotiations with ABB to cure the default. It was always expected that the ABB deal would close. However, even if it did not, Britestarr could have sold the property to another suitor.

19. As part of the negotiations to cure ABB's default on the Option Agreement, on or about February 21, 2001 Britestarr entered into a Forbearance Agreement, with ABB and the Creditors, who obtained their foreclosure judgment on December 27, 2000. (A copy of the Forbearance Agreement is attached hereto as Exhibit D.)

20. In the Forbearance Agreement, the Creditors agreed not to foreclose on the Britestarr property for a period of time in exchange for the payment of substantial consideration described in the Forbearance Agreement, pending ABB's purchase of the property.

21. At the time of the execution of the Forbearance Agreement the Creditors knew that the purpose of the agreement was to a delay foreclosure sale because more money could be raised through the sale to ABB.

22. The Creditors also knew that the Debtor was the sole shareholder of Britestarr and that he would use the proceeds of the sale of the Britestarr property to fund his reorganization.

23. Accordingly, the bankruptcy estate and the Debtor were third-party beneficiaries of the Forbearance Agreement because the parties to the Forbearance Agreement (Britestarr, ABB and the Creditors) intended to confer a benefit upon the Debtor and the estate, in that they would not foreclose on the Britestarr property because the proceeds raised by the sale the property would inure to the Debtor, as sole shareholder of Britestarr, and, therefore, the estate.

24. Moreover, the Creditors obligated themselves to not foreclosing on the Britestarr property except for the reasons set forth in the Forbearance Agreement.

25. Rather than purchase the property as agreed in the Option Agreement, ABB instead initiated litigation seriously undermining and complicating the Debtor's ability to submit a plan for reorganization.

26. ABB has initiated litigation in New York state court in the matter entitled <u>ABB Equity Ventures, Inc. v. Britestarr Homes, Inc.</u>, Index No. 60123/01, seeking, *inter alia*, to terminate the Option Agreement and enjoin the Debtor selling Britestarr from selling the property to any third party.

27. Thereafter, Oak Point Properties, Inc. ("OPP") filed an Adversary Proceeding in this bankruptcy case entitled Oak Point Properties, Inc. v. Nokin, Adv. Proc. No. 01-5144 (hereafter referred to as the "Oak Point Adversary Proceeding"), challenging the Debtor's ownership of Britestarr.

28. Thus, the funding source for a reorganization, sale of the Britestarr property, to pay creditors has been delayed by litigation with ABB and OPP. Further, since OPP has challenged the Debtor's ownership of Britestarr, he cannot, on behalf of Britestarr, at this time, secure an alternate purchaser for the property. Thus, the ABB and OPP litigation has caused significant delays in proposing a plan of reorganization, which would be funded by the eventual sale of the Britestarr property.

29. Litigation prompted and commenced by ABB and its subsidiary, OPP, which, upon information and belief is to leverage a lower purchase price for the Britestarr property has been the cause of any delay in this matter.

30. Further, because of the nature of the ABB and OPP litigation, their resolution is a condition precedent to the Debtor being able to sell the Britestarr property and the sale of the Britestarr property is critical to pay off the Creditors and fund a reorganization plan.

31. Recently, the Creditors declared a default on the Forbearance Agreement and, the Debtor believes, are proceeding with the foreclosure of the Britestarr property for alleged non-payment of property taxes. To the best of the Debtor's knowledge, without any prior notice to him, the State of New York filed a property tax lien on property that may not even belong to Britestarr, but named Britestarr in a tax foreclosure proceeding.

32. Upon information and belief, there are no outstanding property taxes due on the Britestarr property.

33. Moreover, non-payment of property taxes is not a basis for default listed in the Forbearance Agreement for the Creditors terminating the agreement and proceeding with their foreclosure action. Also, pursuant to the Forbearance Agreement, the consideration tendered by Britestarr to the Creditors did not include payment of the property taxes.

34. As a direct and proximate result of the Creditor's declaring the Forbearance Agreement in default based in the allegation, albeit incorrect, that the Debtor has failed to pay property taxes on the Britestarr property, the Creditors have breached and otherwise violated the Forbearance Agreement.

35. As a direct and proximate result of the Creditors' breach of the Forbearance Agreement, the Debtor will suffer irreparable injury in that:

    a. The Debtor will be deprived of use of the Britetarr property, which is critical to funding a plan for reorganization; and

    b. The Britestarr property will be sold in a disorganized fashion rendering the Debtor's Britestarr shares valueless and raising little money to fund a reorganization. Consequently, the estate would be left essentially insolvent and the claims of other creditors would likely not be paid. Therefore, the Creditors foreclosure action must be stopped to protect the other creditors and the integrity of the estate.

36. As a further direct and proximate result of the Creditors' breach of the Forbearance Agreement the estate and other creditors will suffer irreparable and immediate harm in that:

    a. If the Britestarr property is sold the Debtor's shares in Britestarr will be worthless. If the Debtor's shares in Britestarr are worthless, claims against the estate are unlikely to be paid; and

    b. The Britestarr property is commercial property on which a power plant will be built. Accordingly, there are significant land use, public utility, regulatory and environmental issues that must be resolved prior to any closing. If the Britestarr property were sold at a foreclosure auction "as is" it is unlikely that its true value would be recognized. Without a properly seasoned sale, and the ability of the buyer to conduct the required

7

due diligence, the funding of a plan for reorganization would be severely compromised.

37. The Debtor submits that there is a substantial likelihood that he will succeed on the merits of this matter, in that he will be able to submit a plan for reorganization that will be confirmed. Once the litigation matters are resolved and the Debtor's ownership of the Britestarr shares are confirmed, he will be able to sell the Britestarr property and pay off the Creditors' lien. Given the expected sale price, there will be sufficient money left to fund a reorganization and pay off other claims against the estate.

38. Due to the pending litigation, sale of the Britestarr property and, therefore, the raising of funds to pay claims against the estate has been delayed. However, since the Creditors position is well protected, little, if any harm, would befall them by prohibiting them from continuing their foreclosure action. Following the sale of the Britestarr property the Creditors' lien would be paid first. The remaining money raised from the sale would inure to the bankruptcy estate.

39. The harm that would be done to the Debtor (rendering the estate insolvent and making payment of the claims of other creditors likely impossible) should the foreclosure action be permitted to continue, is particularly severe and, therefore, outweighs any harm to the Creditors, if any, particularly given the security of the their position.

40. Additionally, given that the Creditors' position is adequately protected, it is in the best public and judicial interest to permit an orderly sale of the Britestarr property in order to maximize the value of the bankruptcy estate to ensure that as many claims against the estate as possible are paid.

41. Since there is substantial equity in the subject property, even after accounting for the indebtedness owed thereon, the value of the Britestarr shares represent the most valuable

asset of the Debtor's estate. If the property is foreclosed, the shares the Debtor owns in Britestarr will be worthless.

42. Use of the Britestarr shares and the property is critical to the Debtor's plan for reorganization. The Creditors attempts to continue with their New York foreclosure must be immediately stopped in order to protect the integrity of the estate and permit for an orderly reorganization. Moreover, given that the value of equity remaining in the Britestarr property far outweighs any indebtedness thereon, the Creditor's position is adequately secure.

43. Pursuant to 11 U.S.C. § 105(a), the Creditors should be enjoined from foreclosing on and selling the Britestarr property..

**COUNT TWO: Interference with the Automatic Stay**

1 – 42. The Debtor incorporates by reference paragraphs 1 through 42 of Count One in this count as if fully set forth herein.

43. Thus, while ostensibly not seeking to continue their foreclosure action against the Debtor, the Creditors are attempting to enforce a foreclosure judgment obtained in New York state court, which would effective exert control over the Britestarr shares which are property of the bankruptcy estate.

44. It is clear that the Creditors intentionally and willfully violated the bankruptcy stay by attempting to exert control over property of the Bankruptcy estate. Pending the outcome of the ABB litigation, the Oak Point Adversary Proceeding and this adversary proceeding there is a asset scheduled on the Debtor's Bankruptcy Schedules, the Britestarr property, which it critical to the Debtor's reorganization and when sold will generate sufficient money to pay the Creditors and other allowed claims against the estate.

45. Pursuant to 11 U.S.C. § 105(a), the Creditors should be enjoined from foreclosing on and selling the Britestarr property.

WHEREFORE, the Debtor prays for the following relief

1. A temporary restraining order prohibiting the Creditors to pursue any foreclosure or sale with respect to the Britestarr property.

2. A preliminary and permanent injunction prohibiting the Creditors from pursuing any foreclosure actions with respect to the Britestarr property, without first obtaining leave of this Court.

3. Money damages.

4. Statutory costs.

5. Any other relief that the Court may deem just and equitable.

THE DEBTOR-PLAINTIFF: David Norkin

BY _____
Matthew K. Beatman (ct08923)
Jeffrey M. Sklarz (ct20938)
Zeisler & Zeisler, P.C.
558 Clinton Avenue
Bridgeport, CT 06605
(203) 368-4234

## VERIFICATION

I, David Norkin hereby verify that I have personal knowledge of the matters contained in the Verified Adversary Complaint and that the information in the Verified Adversary Complaint is true to the best of my knowledge and belief.

_____
David Norkin

Subscribed and sworn to before me, on this the 8th day of April, 2002.

_____
Notary Public/
Commissioner of Superior Court
Jeffrey M. Sklarz, Esq.

2000 USBC, District of Connecticut

| B 104 (Rev 2/92) | **ADVERSARY PROCEEDING COVER SHEET** (Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER (Court use Only) |
|---|---|---|
| **PLAINTIFFS** David Norkin | **DEFENDANTS** Craig Galea and Mark Kruse | 02 5015AHWS |
| **ATTORNEYS** (Firm Name, Address, Telephone No.) Zeisler & Zeisler, PC 558 Clinton Ave Bridgeport, CT 06605 | **ATTORNEYS** (If Known) | |

**PARTY** (Check one box only)  ☐ 1 U.S. PLAINTIFF   ☐ 2 U.S. DEFENDANT   ☒ 3 U.S. NOT A PARTY

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Count 1: Breach of Contract
Count 2: Interference with the Automatic Stay
11 U.S.C. 362

**NATURE OF SUIT**
(Check the one most appropriate box only.)

- ☐ 454 To Recover Money or Property
- ☐ 435 To Determine Validity, Priority, or Extent of a Lien or Other Interest in Property
- ☐ 458 To obtain approval for the sale of both the interest in the estate and of a co-owner in property
- ☐ 424 To object or to revoke a discharge 11 U.S.C. §727
- ☐ 455 To revoke an order of confirmation of a Chap. 11, Chap. 12, or Chap. 13 Plan
- ☐ 426 To determine the dischargeability of a debt 11 U.S.C. §523
- ☒ 434 To obtain an injunction or other equitable relief
- ☐ 457 To subordinate any allowed claim or interest except where such subordination is provided in a plan
- ☐ 456 To obtain a declaratory judgment relating to any of foregoing causes of action
- ☐ 459 To determine a claim or cause of action removed to a bankruptcy court
- ☐ 498 Other (specify)

**ORIGIN OF PROCEEDINGS** (Check one box only.)  ☒ 1 Original Proceeding   ☐ 2 Removed Proceeding   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from Another Bankruptcy Court   ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

**DEMAND** NEAREST THOUSAND $    **OTHER RELIEF SOUGHT** Injuntive relief   ☐ JURY DEMAND

**BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES**

| NAME OF DEBTOR David Norkin | BANKRUPTCY CASE NO. 97-50043 (AHWS) | |
|---|---|---|
| DISTRICT IN WHICH CASE IS PENDING Connecticut | DIVISIONAL OFFICE Bridgeport | NAME OF JUDGE Shiff |

**RELATED ADVERSARY PROCEEDING (IF ANY)**

| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
|---|---|---|
| DISTRICT | DIVISIONAL OFFICE | NAME OF JUDGE |

**FILING FEE** (Check one box only)  ☐ FEE ATTACHED   ☐ FEE NOT REQUIRED   ☒ FEE IS DEFERRED

| DATE 4-8-02 | PRINT NAME Jeffrey M. Sklarz, Esq. | SIGNATURE OF ATTORNEY (OR PLAINTIFF) |

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF CONNECTICUT

IN THE MATTER OF David Novkin

**DEBTOR(S)**

CASE NO. 97-50043

ADV. NO. 02-5015

DOC. # 1

**CLAIM #**

# SUBSTITUTION FORM

The attachments to this document were not imaged. If these attachments need to be reviewed and/ or copied, please refer to the original case file.

DEBORAH HUNT

CLERK OF COURT